CASSIN (PALMER v.). See Case No. 10,-687.

CASSIUS, The (ARTHUR v.). See Case No. 564.

CASSIUS, The (KETLAND v.). See Case No. 7,743.

CASTEEL (HENDERSON v.). See Case No. 6,350.

## Case No. 2,504.

CASTELLO v. BOUTEILLE et al.

[Bee, 29.][1]

District Court, D. South Carolina. March 18, 1794.

CAPTURE BY PROSCRIBED PRIVATEER—SUBSEQUENT CAPTURE BY DULY-COMMISSIONED PRIVATEER — OUSTER OF JURISDICTION.

1. Jurisdiction of the court is ousted in case of capture on the high seas, by a privateer lawfully commissioned, of the property of an enemy to the sovereign issuing the commission.

2. The case is not altered though the capture should have been originally made by a proscribed privateer.

In admiralty.

The libel states that Castello was owner and commander of the brigantine St. Joseph, which was loaded in the port of Carthagena by himself and other subjects of Spain, which is in amity with the United States. That on the 22d of September last, in his way to Cadiz, he was captured on the high seas by the sloop Fair Margaret, commanded by F. H. Hervieux, and carried into Cape Fear river in North Carolina. That two days after their arrival within the bar of Wilmington, the said sloop and brigantine suddenly weighed anchor and proceeded to sea. This is said to have been in consequence of directions from the president of the United States to the governor of North Carolina to take possession of the brigantine and deliver her up to the libellant.

The libel further states that Hervieux then proceeded to Charleston, where, upon some agreement between him and the defendant Bouteille, the latter went to sea in the Sans-Pareille, and, at some distance from the bar of Charleston, took possession of the brigantine, landed the Spanish crew in Georgia, and brought the vessel into Charleston. Hervieux and his people had previously quitted her.

The libel also states some proceedings respecting the brigantine and cargo in consequence of directions from the president of the United States to the governors of North and South Carolina, the latter of whom declined all interference. And the collector of Charleston, not thinking himself authorized to detain the vessel, she was finally left in

[1] [Reported by Hon. Thomas Bee, District Judge.]

the hands of Bouteille. Whereupon, by a decree of the consul of France, the said vessel and cargo were advertised and sold, except fifty bales of cotton, which were taken into the custody of the marshal of this court by warrant issued therefrom. The libel concludes by praying restitution of vessel and cargo, and compensation for the detention of the same.

The jurisdiction of the court is denied by a plea which states, that the Sans-Pareille was a private vessel of war, duly commissioned by France to capture and make prize of all vessels, goods and merchandize found on the high seas, and belonging to the king of Spain or any of his subjects. That by virtue of this commission Bouteille captured this vessel and cargo on the high seas, and without the limits and authority of the United States. That by the 17th article of the treaty with France, this court is precluded from investigating the lawfulness of the capture and making any decree thereon. Plea concludes with a prayer that the suit may be dismissed with costs.

In support of the plea it was insisted that a neutral tribunal cannot determine the validity of prizes made by two belligerent powers from each other. That the 17th article of the treaty with France is conclusive as to the present question. That the 5th article of the convention with the United Netherlands compared with the 2d article of the treaty with France, to which it refers, is also conclusive. That this question has already been decided in the district courts of Pennsylvania and New-York, against the jurisdiction, in cases not so strong as that before this court. That on the face of the libel it appears that the question of prize or no prize is involved in this case. That this court having no power to condemn, of course cannot restore. Lee. Capt. 77, 78, 81, 220, 221; Bynk. 191, 194; 2 Vatt. Law Nat. 263–265. That this court, not being authorized to decide the question of prize, cannot determine whether the first or second capture was legal, or whether either of the privateers was proscribed. That the president, knowing this, referred the inquiry to the governor, and not to this court, as a matter properly cognizable by the executive, and not by the judiciary. That the opinion of individuals ought not to operate with the court, the treaty being plain and conclusive. That the jurisdiction of this court is defined by the 9th section of the act for establishing judicial proceedings, and does not extend to cases of captures. The advocates for the libellant contend that this is a case of a peculiar nature, and must be determined on its own grounds, as it differs from any case in the books. That the St. Joseph having been captured by a proscribed privateer, must be restored, into whatever port of the United States she may go. That if the doctrine contended for on the other side should obtain, a neutral vessel may be cut out of our harbours or from our wharves, without re-

dress. That the president of the United States having already settled the principle, this court must restore if the present case comes up to that principle. The opinions of the secretary of state, and solicitor-general of Virginia were produced, in which those gentlemen recommended an application to the judiciary. Beaw. Lex Merc. 206, was quoted to support the jurisdiction of this court. It was said that the question was not whether the treaty should be fulfilled; but whether this case comes within the treaty. That if this court is deprived of jurisdiction in all cases of prize, it could not give redress for a breach of neutrality in our own harbours. That the article of the treaty with Holland extended merely to matters of trade and navigation, and did not apply here.

From these pleadings and arguments, it appears to me that the court must decide three points. 1st. Whether the St. Joseph was the property of Spanish subjects, or not. 2d. Whether the capture was made by the citizens of France on the high seas, beyond our limits of jurisdiction. 3d. Whether this court has any jurisdiction, if the two preceding points should be determined in the affirmative. As the libel states expressly the Spanish character of this vessel and cargo, it is unnecessary to say a word upon that part of the subject.

It is not contended by the libellant that the privateer was owned by other than French citizens, or that there is any defect in her commission. But it is said that the original seizure was made by a proscribed privateer; and much stress is laid upon the subsequent interference of the president of the United States. The court cannot notice this. The constitution has wisely separated the judicial and executive departments, and we must not infringe the barriers. At any rate the Sans-Pareille was not within the president's censure; and if the Fair Margaret was improperly fitted out in our ports, and proscribed on that account, complaint must be made to the executive, who will proceed by negotiation to obtain the due redress.

Arguments are drawn from a comparison of the 5th article of the convention with Holland to the 2d of the treaty with France. Neither of them seems to me to apply to this case. The treaty with France is of a general nature, and intended to be permanent under all circumstances of war and peace with other nations. The convention with Holland is distinct from our treaty with that power, and relates expressly to recaptured vessels, and to prizes made by either party on their common enemy. As to vessels cut away from a wharf, or captured in our harbours, such acts would amount to felony or piracy and the court would not hesitate to exercise jurisdiction, independently of any treaty in existence. The citizens or subjects of foreign nations receive protection, and owe a corresponding alle-

giance; and what would be criminal in one of our own citizens would be equally so in them, while this state of things lasted.

The cases of the ship William, and brigantine Catharine, decided in the district courts of Philadelphia and New-York, though differing materially from the present, have been adduced to illustrate the point of jurisdiction. I have read both decisions with pleasure; they are ably drawn up, and are, I presume, correct, as no appeal from either has taken place. As to their being the opinions of individuals, I see no reason why that circumstance should deprive them of all right to consideration. Respectable character for legal knowledge, supported by sound argument and clear deduction, will always command respect as well in the case of a judge of the United States as in those of Vattel, Bynkershoek, Puffendorf, or Beawes. But these opinions are confirmed by the language and conduct of the president of the United States, as contained and evinced in the letter from Secretary Jefferson to Mr. Morris, our minister in Paris. This proceeding of the executive has been submitted to both branches of the legislature, and has met with their decided approbation. This, it is true, wants the forms of law, and is not, therefore, binding upon a judge. If, however, his own opinion concurs, as mine does in the present case, much satisfaction must be derived from the coincidence of sentiment with the men so dignified by their wisdom and patriotism.

Upon the whole, I am clear that the plea in this case is relevant; that the libel must be dismissed; and that the fifty bales of cotton must be delivered up.